IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOHN V. GROSS, JR.,

Plaintiff,

v.

GARY BOUGHTON, DAN WINKLESKI,
MICHAEL KARTMAN, BRIAN KOOL,
SGT. SNODGRASS, C.O. MCCULLUM,
C.O. WETTER, ELLEN RAY, WILLIAM BROWN
and T. SEBRANEK,

Defendants.

OPINION AND ORDER

16-cv-759-wmc

*Pro se* plaintiff John V. Gross, Jr., has been granted leave to proceed under 42 U.S.C. § 1983 on claims against prison staff at the Wisconsin Secure Program Facility ("WSPF"), which arise out of limitations placed on his recreation periods following a 2016 assault, as well as responses to his complaints about how the lack of recreation affected his mental health. In particular, the court granted Gross leave to proceed on: (1) Eighth Amendment claims that defendants responded with deliberate indifference to his need for more recreation time and mental health treatment; and (2) a Fourteenth Amendment due process claim that special recreation limitations imposed by defendants, when considered along with uniquely restrictive characteristics of WSPF itself, amounted to a loss of a liberty interest without due process.

Now before the court is defendants' motion for summary judgment. (Dkt. #27.) Since the evidence of record would not permit a reasonable trier of fact to find for Gross on the merits of his constitutional claims, and qualified immunity shields defendants from monetary damages in any event, the court will grant defendants' motion.

UNDISPUTED FACTS[1]

## A.      Parties

While plaintiff John Gross currently is incarcerated at Green Bay Correctional Institution ("GBCI"), at all times relevant to his claims, plaintiff John Gross was a prisoner at WSPF, where all defendants worked.  Defendants are:  WSPF Warden Gary Boughton; Dan Winkleski; Security Director Mark Kartman; Brian Kool; Michael Snodgrass; Ellen Ray; William Brown; and Victoria Sebranek.

## B.      Gross's Housing and Access to Leisure Activities Over Time

WSPF has four housing units for its general population prisoners:  Charlie Unit, Delta Unit, Echo Unit and Foxtrot Unit.  Gross was an inmate in the Charlie Unit from December 2015 to April 2017, at which point he was transferred to the Echo Unit.  Gross remained in the Echo Unit until he was transferred to GBCI in May 2019.

Gross's cell in the Charlie Unit was approximately 12.5 by 6.5 feet.  That cell had a skylight, although Gross maintains he could not see through it.  Gross did not have a cellmate.

The Wisconsin Administrative Code requires prisons to provide prisoners access to at least four hours of "leisure time activity" per week, which encompasses time for sports and other recreational activities such a reading, crafts or watching television.  Wis. Admin. Code § DOC 309.36.  Prisoners assigned to Charlie Unit have access to several spaces for scheduled, out-of-cell time, including:  a large outdoor courtyard with several basketball

---

[1]   The following undisputed facts are drawn from the parties' proposed findings of fact and responses, as well as the underlying evidence cited in those proposed facts as applicable.

courts and numerous tables; a 33' x 15' indoor recreation room for activities such as basketball or handball; a 33' x 15' indoor weight room; and 18' x 15' indoor dayrooms with two tables, a telephone and a television. While Gross does not explicitly dispute these layouts, he adds that access to these spaces is determined by a preset schedule, and only during periods of warm, clear weather. He also maintains that there is only one basketball court; the indoor recreation room is concrete and has an "immobile" basketball hoop; only four people are allowed in the indoor recreation room at a time; it is difficult to play handball because of the fixed basketball hoop; the indoor weight room houses a universal weight machine that takes up 10 square feet of the room; the two dayrooms have only one phone each; and only one dayroom has a television.

Leisure time activity in Charlie Unit and Delta Unit is also scheduled differently than leisure activity in the Echo and Foxtrot Units by virtue of their different physical layouts. Specifically, the Charlie and Delta Units have access to a large outdoor courtyard, but Echo and Foxtrot each have access to separate, smaller outdoor courtyards. As a result, Charlie Unit prisoners received about 4 hours and 10 minutes of recreation time per week, and 6 hours and 15 minutes of dayroom time per week, and Echo and Foxtrot Unit prisoners receive a total of 11 hours of time per week when they can use the recreation or dayroom areas.

Up until June of 2016, the Charlie and Delta Unit leisure time was scheduled the same way as the Echo Unit, with Charlie and Delta Unit prisoners allowed to choose between accessing the courtyard or dayroom. That said, when the weather was bad, Charlie and Delta Unit prisoners were allowed to go to the dayroom, or if less than five inmates

were interested in using the courtyard, it would not be opened, leaving prisoners with the choice of using the inside recreation room or the dayroom. Further, on weekends and holidays, prisoners could only access the dayrooms.

Charlie Unit prisoners were also allowed to be outside their cells at other times beyond leisure and recreation periods, including for visitations, meals, law library time, jobs, programming and laundry exchange. Gross adds that these opportunities for out-of-cell time were limited, however, in that laundry exchange only takes about five minutes per week, jobs were difficult to obtain, programming is only available to eligible prisoners, and visitations are only available to prisoners with visitors. Furthermore, Gross points out (and defendants do not dispute) that his outdoor recreation time was cancelled intermittently due to staff training and inclement weather, while defendants point out that prisoners could perform in-cell exercise during these periods as an alternative.

In March 2016, WSPF changed the recreation schedule to provide more out-of-cell time to prisoners. Rather than allowing only two ranges to use the large outdoor courtyard at a time, 2 ½ ranges were allowed to access that space. This change increased recreation time for prisoners by 45 minutes per week.

Things changed again in May of 2016, however, when there were multiple, prisoner-on-prisoner assaults in the Echo Unit, barbershop and kitchen areas. Between May 18 and June 14, 2016, therefore, WSPF operated in a "slowdown mode," in which regular administrative rules were suspended. During this slowdown, prisoner movement was much more restricted. For example, prisoners received meals in their cells, were not allowed to use dayrooms or recreation areas, and contact visits were suspended, although certain

movements were gradually phased back into the schedule.[2]

While the slowdown ended by June 14, 2016, the more limited out-of-cell recreation schedule that was in place before March 2016 also went back into effect within a month. Specifically, on July 1, 2016, Deputy Warden Winkleski issued a memorandum explaining that the schedule was officially changing back as of July 11, and instructing prisoners to contact their unit managers with questions. Boughton avers that they switched back to the old schedule out of concerns about the number of prisoners being allowed to congregate in common areas during leisure time activities.

Under this schedule, the parties disagree whether Charlie Unit prisoners were still allowed at least four hours of recreation time per week and at least six hours of dayroom time each week. Gross asserts that *only* the Charlie and Delta Units had a new recreation schedule, and it was actually more restrictive than the previous schedule. Specifically, Gross claims that the new recreation schedule allotted just 50 minutes for courtyard time and one hour for dayroom time during leisure periods, without the ability to choose between the courtyard and dayroom. Gross further claims that the first and second Tuesday of every month were training days, so recreation periods were regularly cancelled on those days. This, he claims, reduced the time that Charlie Unit prisoners had for exercise from 4 hours and 10 minutes per week to 3 hours and 30 minutes per week.

---

[2] According to Warden Boughton, the institution-wide slowdown and suspension of prisoner movement was warranted because the assaults occurred in common areas where prisoners were allowed to congregate, and it appeared the assaults involved gang disputes. Moreover, even though the assaults did not take place in the Charlie Unit, gang members were located throughout WSPF.

Dissatisfied with the change after the slowdown ended, Gross wrote to Unit Manager Kool, asking for a reason for the new schedule and a definition of the new release times. After Kool failed to respond to that letter, Gross next wrote to Security Director Kartman, who on July 18, 2016, simply referred Gross back to Winkleski's explanation for the change as set forth in his July 1 memorandum. Still trying for an answer, Gross wrote directly to Warden Boughton, who received his letter on July 31. Unfortunately, Gross raised multiple unrelated concerns in that letter, including his recent surgery, attempts to find a job, the slowdown, recreation time, visitation time, phone time, and his desire for a prison transfer. On August 3, 2016, Boughton responded by memorandum, touching on Gross's various concerns. As to Gross's complaint about recreation time in particular, Broughton explained that WSPF "provides more out of cell time than mandated by code." (Ex. 1006 (dkt. #30-6) 4.)

In August, Gross learned that prisoners in the Echo Unit did not have a new recreation schedule. Two prisoners placed in the Echo Unit, Eric Hainstock and Todd Frost, provided Gross with affidavits confirming that they were not subjected to similar recreation and leisure restrictions as prisoners in the Charlie Unit. This prompted Gross to write to Kool, Kartman and Boughton again, complaining that his equal rights were being violated.

## C. Gross's Inmate Complaints

Gross also filed several, formal inmate complaints about the recreation schedule following the slowdown. Generally, Gross complained that the recreation periods were inadequate, that access to outdoor recreation was taken away without an alternative, and

that his recreation period was shortened inappropriately, as well as referenced his due process and equal protection rights entitling him to relief. (Ex. 1007 (dkt. #31-2 through #31-9.) In her capacity as an Inmate Complaint Examiner ("ICE") of WSPF, defendant Ray rejected these complaints, explaining, as had Boughton, that WSPF provided more out of cell time than required by the administrative code. On review, both Brown and Boughton agreed with Ray's assessment. Nevertheless, Gross maintains that defendants Ray, Brown and Boughton all rejected his complaints without an actual investigation.

### D.     Health Care Requests

In addition, Gross separately submitted several Psychological Service Requests ("PSR's") complaining about his limited recreation time. On September 5 and 17, 2016, Gross submitted PSR's reporting that his mood was in decline since the slowdown *and* checking the box on the PSR form affirming that he wanted to see PSU staff. More specifically, in his September 5 PSR, Gross wrote:

> Since the recreation times for Charlie Unit have been reduced from 2 hours to 50 mins I have experienced a[n] obvious, significant decline in my moods, behaviors. I feel better when I'm able to go out & exercise [illegible], here where I'm trapped in this cell 22-23 hours a day. Further I feel that the opaque windows viewed through the clear window in cell also contribute to this decline as well as contribute to the feelings of sluggish, hazy, unable to function mentally/physically. PSU needs to do something to [illegible] these issues asap.

(Pl. Ex. 16 (dkt. #40-13).) Psychological Associate Sebranek, who worked at WSPF between March 2, 2015, and December 29, 2016, responded to the September 5 PSR as follows:

> I consulted with security staff it is my understanding that your time is made up by allowing more frequent access to rec/phones/dayroom. I will have to

redirect you to security in regard to how rec time is distributed.  If you need some coping skills or enhanced ways to manage the psychological effects, please let us know.

(*Id.*)  On September 17, Gross then submitted a second, more pointed PSR, this time complaining that Sebranek should do more:

> I do not understand . . . your reply dated 9-8-16, I am under the belief that you, PSU staff, have a duty to ensure the mental health - well being, of me & all other similarly situated inmates, by being notified of WSPF's recent severe restrictions on exercise, restrictions I note only inflicted upon C&D Unit [prisoners], have a responsibility to not only investigate such reasons, justifications -- if any -- but to advocate on my behalf to ensure my mental health needs are upkept w/ not only your prof. standards, but that of expectations of the courts, as several have recently ruled that exercise is no longer a "privilege" but a "basic human right" needed to balance mental well-being.  Further the sensory deprivation I, and others, are being subjected to . . . severely limited view of daylight or outside stimuli throughout the day at WSPF is violating my U.S. Const. Right(s), so for you to acquiesce to security's rote reasonings is unacceptable & I'm asking you to thoroughly/aggressively advocate on my behalf for humane conditions.

(Pl. Ex. 17 (dkt. #40-14).)  Sebranek responded to that PSR:

> Again, your mental health is your responsibility & PSU will do what we can to provide you with the skills necessary [and] appropriate for your limited environment.  If you are willing to do the work necessary, please request an appointment.

(*Id.*)

Gross submitted a third PSR on December 26, 2016, complaining that he had already reported his declining mental health, but was being ignored.  He also reported that the continuing restrictions on recreation time were reminiscent of the time he had previously spent in segregation.  In addition, Gross again requested to be seen by PSU staff by checking that box in the PSR.  The December 27, 2016, response to Gross from another PSU staff member, a non-defendant named "Mink," once again ignored his request to be

8

seen.  Sebranek avers that she would not have known about this PSR because Mink responded to it.  Gross maintains that his pre-existing mental health conditions have worsened due to his more restricted access to recreational activities.

### E.    Gross's Previous Placement in Administrative Confinement and the Conditions of General Population

Since Gross's due process claim relates to the conditions in general population at WSPF, he provided evidence related to his experiences in other DOC institutions as compared to WSPF.  Gross was transferred to WSPF in 2011, after an assault on staff at Dodge Correctional Institution, where he was then incarcerated.  Gross was placed on administrative confinement status, a segregated status used at the discretion of staff after determining that a prisoner poses safety and security risks.  While Gross was on administrative confinement, he was housed in a segregated range within the Echo Unit. He was allowed to possess legal paperwork, up to 25 soft-covered publications, up to 50 photographs, up to 12 pens or pencils, a television, shower shoes, a rug, slippers, canteen and hygiene items.  He was also offered visitation through a closed-circuit video system for two, two-hour sessions a week, along with access to the law library (a small room with a computer and several law books) for 1-3 hours per week.  Finally, Gross had the opportunity to participate in indoor and outdoor recreation periods, and he claims he participated in recreation periods semi-regularly, although only one prisoner was allowed to access the recreation area at a time.

Gross progressed out of administrative confinement and was placed in general population in the Echo Unit on around January 29, 2015.  Until December 2015, when

Gross was moved to the Charlie Unit, his new cell was very similar to his administrative confinement cell. However, Gross's privileges in general population were more expansive than when he was in administrative confinement status. For example, in general population, Gross had employment opportunities, access to groups, recreation periods with other prisoners, the ability to have in-person visits, additional hardcover books, personal clothing, and additional electronics. Additionally, Gross was allowed to eat meals out of his cell, even if given only 10 to 20 minutes to do so.

Without disputing any of these additional privileges in general population as compared to administrative confinement, Gross claims that he personally was not allowed to participate in any groups or work, nor was he able to have contact visitation until June of 2015 because no room was available. Even more material, in Gross's view, are the similarities between the administrative confinement and general population cells at WSPF distinguished from the general population cells in which he has been housed in at other DOC institutions. In particular, Gross points out that *all* of the cells at WSPF were designed to hold prisoners in restrictive housing and not general population, and that WSPF never modified its cells when it began classifying prisoners as general population. For example, according to Gross, some prisoners still on restrictive housing status have been moved to Foxtrot units, even though that unit had been completely transitioned into a general population unit. Moreover, Gross maintains that the cells in the general population units at WSPF resemble the restrictive housing cells at the Green Bay, Waupun and Dodge Correctional Institutions.

Gross further avers that the indoor recreation areas at GBCI have clear windows, which provide more natural light than the 18"x 3" windows in the indoor recreation rooms at WSPF, which only allow him to see into a hallway and not outside. Finally, Gross contrasts his current privileges at Green Bay compared to those at WSPF: at GBCI, he has a job and a *minimum* of 4 hours and 30 minutes of recreation/outdoor time per week. Moreover, if outdoor recreation is cancelled, he is allowed to use an indoor area for exercise, and he was seen by PSU staff at his request.

OPINION

Defendants seek summary judgment in their favor on all of Gross's claims. Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Moreover, if the non-moving party carries the burden of proof, then he or she must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported by only speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

I.      Eighth Amendment

A.      Recreation Time

First, defendants seek judgment in their favor on Gross's claim that the amount of recreation time he had following the 2016 slowdown violated his Eighth Amendment rights.  The Eighth Amendment's prohibition against cruel and unusual punishment imposes upon prison officials the duty to provide prisoners "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  To succeed on an Eighth Amendment claim challenging conditions of confinement, a plaintiff must prove that:  (1) the conditions of confinement were objectively serious, such that they deprive inmates of the minimal civilized measure of life's necessities; and (2) the defendant knew about, but failed to take reasonable measure to prevent the potential harm of that condition. *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999) (citing *Farmer*, 511 U.S. at 834.)  Defendants seek judgment only on the objective element.

The Court of Appeals for the Seventh Circuit has recognized that exercise is "a necessary requirement for physical and mental well-being," and has held that depriving prisoners of "out-of-cell exercise opportunities" may violate the Eighth Amendment. *Delaney v. DeTella,* 256 F.3d 679, 684 (7th Cir. 2001) (prisoner denied all out-of-cell exercise opportunities for 6 months during a lockdown stated an Eighth Amendment claim); *see also Pyles v. Spiller*, 708 F. App'x 279 (7th Cir. 2017) ("A deprivation of exercise that prison officials expect will likely result in severe health

problems may violate the Eighth Amendment, unless the deprivation is proportionate to a legitimate penological purpose.") (citations omitted).

However, "short-term denials of exercise" do not violate the constitution. *Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir. 1997) (denial of outdoor exercise for 70 days permissible); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (denial of out-of-cell exercise for 28 days permissible); *but see Antonelli v. Sheahan*, 81 F.3d 1422, (7th Cir. 1996) (concluding that prisoner who was denied recreation time for up to seven weeks, and then was afforded only one hour of recreation time every two weeks, stated an Eighth Amendment claim).

Gross has not challenged the reduction in out-of-cell time during the slowdown period that took place between May 18, 2016, and June 14, 2016; his claim focuses instead on the change in recreation time allowed in Charlie Unit *after* that slowdown was lifted. So, the question at summary judgment becomes whether Gross's version of his weekly allotment of "out-of-cell exercise opportunities" was so minimal that he was essentially denied a basic human need. *Delaney*, 256 F.3d at 683.

As an initial matter, defendants rely heavily on the fact that WSPF's exercise and recreation schedule met the minimal requirements of Wisconsin's Administrative Code. That may well be true, but compliance with that policy does not necessarily establish that Gross had constitutionally adequate access to exercise. Rather, to answer that question for purposes of summary judgment, the court starts with Gross's own calculation of his weekly exercise time: for two weeks out of every month, he had 3 hours and 30 minutes of scheduled exercise time per week; and for the other two weeks, he had 4 hours and 10

minutes of scheduled exercise per week.  Viewing the record in the light most favorable to plaintiff, the court will further assume that certain exercise sessions had to be canceled due to inclement weather, which apparently reduced Gross's access to indoor or outdoor areas by 50 minutes for each cancellation.

The parties dispute how the court should consider plaintiff's additional, 6-hours of "recreation time" in the dayroom per week.  While plaintiff would prefer the court to focus only on the time periods in which he can access indoor or outdoor recreation areas for exercise, the cases plaintiff cites work against him.  Indeed, in those decisions, courts generally factored in various types of out-of-cell time into the analysis.  For example, he cites *Davenport v. DeRoberts*, 844 F.2d 1310 (7th Cir. 1988), to buttress his argument that he was required a minimum of 5 hours of recreation time per week.  However, that decision did *not* adopt a bright-line, five-hour-minimum rule.  In *Davenport*, a class of prisoners incarcerated in Illinois' maximum-security prison challenged various aspects of their conditions of confinement, and a jury agreed.  *Id.* at 1311.  The district judge then entered an injunction that provided, in relevant part, for at least five hours of out-of-cell exercise per week, which the Seventh Circuit found reasonable.  The court also specifically rejected defendants' argument that prisoners could achieve fitness goals within their own cells, since

> [t]he opportunity to exercise or even just to stand around, outside, in the company of other prisoners, is the inmate's principal break from what otherwise is solitary confinement except for his limited opportunities to visit other parts of the prison on specific and tightly supervised missions.

*Id.* at 1314.

Thus, while the *Davenport* court ultimately agreed that the amount of recreation time in that case -- about 3 hours a week -- was inadequate, it actually considered the *total*

14

amount of out-of-cell time, which included both exercise outside *and* other out-of-cell time. *Id.* Moreover, the court acknowledged the fact-specific nature of the inquiry: "We do not suggest that this is always and everywhere the constitutional minimum; much less may suffice when the period of incarceration is brief." *Id.* at 1316. While the court's reasoning in *Davenport* certainly highlights the importance to prisoners of meaningful access to social interaction during their recreation periods, it neither created a bright-line rule, nor does the reasoning suggest that opportunities for activities like those available to Gross in the dayroom could not factor into whether he had constitutionally-adequate, out-of-cell opportunities for recreation.

Plaintiff also refers the court to a decision from the Ninth Circuit in *Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008), but that decision also involved circumstances in which prisoners were dealing with less out-of-cell exercise per week than Gross. Specifically, in *Pierce*, the Ninth Circuit reversed a district court decision that terminated an injunction requiring jail officials to provide jail inmates with at least 2 hours of out-of-cell exercise time per week and at least 2 hours of dayroom time per week. *Id.* at 1213. While the district court had reasoned that inmates did not need more than 90 minutes per week of exercise time, the Ninth Circuit disagreed, reinstating the 2-hour requirement for both exercise time and dayroom time. *Id.* at 1212-13. The court specifically included the amount of dayroom time as a factor in evaluating whether out-of-cell time passed muster under the Eighth Amendment. *Id.* at 1212 n.12.

Here, Gross does not dispute that his total amount of access to exercise areas and the dayroom exceeds the five-hour weekly "minimum" he would derive from *Davenport*.[3] Instead, he complains that the Echo and Foxtrot Units have recreation schedules that have allowed them more access to outdoor courtyards. Moreover, Gross was not given leave to proceed on an equal protection claim related to access to recreation,[4] so his comparison of the recreation schedule to other WSPF units is not before the court. Gross also takes issue with the fact that before the slowdown, he had the opportunity to choose between exercise activities and dayroom activities, but after the slowdown was lifted in June 2016, he no longer was allowed to choose between "exercise" and "recreation." Still, Gross does not dispute that, *at minimum*, he has access to exercise facilities at least 3 hours and 30 minutes a week, and a dayroom for an additional 6 hours per week, totaling more than 9 hours of out-of-cell time that allows for exercise, leisure activities, and interactions with other prisoners and staff.

---

[3] Defendants suggestion that the court should also factor in plaintiff's out-of-cell time (for meals, visits and the law library) goes too far. The Seventh Circuit's comment in *Davenport* about prisoner movement "to other parts of the prison on specific and tightly supervised missions" suggest that meal-times and time in the law library should not factor into the total out-of-cell time per week. *Davenport*, 844 F.2d at 1314. Here, in particular, Gross avers that his meal time lasts 10 to 20 minutes at most, and the law library is located in a small concrete room. Even without factoring in restrictive, out-of-cell periods of time available to plaintiff, however, a reasonable trier of fact could not conclude that Gross's exercise and recreation periods fell below the minimum requirements of the Eighth Amendment.

[4] The court concluded that plaintiff's allegations did not support a Fourteenth Amendment equal protection clause claim related to the different out-of-cell schedules between WSPF units. (8/30/18 Order (dkt. #11) at 12.) In particular, given that plaintiff's allegations indicated that the layout of the Charlie Unit was a factor in the post-slowdown recreation schedule, plaintiff failed to "allege facts sufficient to overcome the rationality that applies to government classifications." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 639 (7th Cir. 2007); *Flynn v. Thatcher*, 819 F.3d 990, 991 (7th Cir. 2016) ("Prison classifications are presumed to be rational and will be upheld if any justification for them can be conceived.").

To be fair, plaintiff did lose access to the outdoor recreation areas due to inclement weather, and thus lost about 50 minutes of recreation time on occasion during the relevant time period. More specific information about exactly how often that occurred during the relevant time frame may have been helpful, but even assuming he lost another 50 minutes of exercise time per week *every week*, plaintiff still had about 2.5 hours of exercise time and 6 hours of additional recreation time per week. In addition, alternative forms of out-of-cell time that afford the opportunity for exercise can mitigate a lack of access to outdoor recreation areas. *Delaney*, 256 F.3d at 684 (citing *Harris*, 839 F.2d at 1236; *Shelby Cty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1089 (7th Cir. 1986)). Here, Gross does not dispute that he could have performed exercises in his cell. Understandably, he deems this alternative unsatisfactory, given the small cell size (12.5' x 6.5'), his inability to see through the small window and his lost opportunity to socialize with other prisoners. Still, Gross does not provide a specific reason why he could not perform in-cell exercises, nor does he deny that he still had the ability to congregate with other prisoners by taking advantage of his remaining approximate 2.5 hours of recreation time and 6-hours of dayroom time per week.

Gross is also right to point out the uniquely restrictive structure of WSPF generally, having been designed and originally operated as a "supermax" facility, built to house the most dangerous prisoners in extremely restrictive conditions. Indeed, almost twenty years ago, this district court resolved a lawsuit that resulted in substantial changes in both the structure and operations at WSPF. Specifically, in 2001, a class of WSPF prisoners challenged the conditions of their confinement at WSPF. In that case, Judge Crabb found

that: prisoners at WSPF spent "all but *four hours* a week confined to a cell" that is "solid except for a shutter and trap door that opens into the dead space of a vestibule through which a guard may transfer items to the inmate"; prisoners "receive *no* outdoor exercise"; and prisoners were permitted very little opportunities for personal interaction. *Jones "El v. Berge*, 164 F. Supp. 2d 1096, 1098 (W.D. Wis. 2001) (emphasis added). As a result, Judge Crabb imposed a preliminary injunction (1) prohibiting any additional, seriously mentally ill prisoners from being transferred to WSPF; and (2) requiring prison officials to take additional steps to remove certain, seriously mentally ill prisoners already housed at WSPF. *Id.* at 1125-26. Subsequently, the class entered into a settlement agreement with DOC officials, in which the defendants agreed, among other things, to (1) provide more out-of-cell exercise, (2) expand face-to-face visitation, and (3) build an outdoor recreation area. *Freeman v. Berge*, 68 F. App'x 738, 741 (7th Cir. 2003). While Gross points to aspects of WSPF's physical structure that appear to have remained unchanged, such as the size of his cell and the quality of light that comes in, there is no dispute that as of Gross's time there, WSPF had made structural changes to afford prisoners outdoor exercise opportunities. Moreover, as illustrated by the modifications to the recreation schedule in March 2016 before the May assaults, WSPF officials continue to make efforts to increase prisoner movements and opportunities for interactions.

More to the point, the evidence of record establishes that Gross had the ability to exercise in both the indoor and outdoor recreation areas. Understandably, he also complains that the 33 x 15 outdoor area is too small to allow for a game of basketball and handball to take place at the same time; the universal weight machine takes up most of the

room in the indoor recreation area; and there is a 4-person limit in the indoor recreation area. However, even assuming these facts to be true, Gross principally points to inconveniences in his exercise experiences, not prohibitions on exercise.

Finally, to the extent that this is a closer call given the limitations of smaller cells and recreation areas available at WSPF, defendants would still be entitled to qualified immunity on this record. "Qualified immunity protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)). This inquiry is two-fold: "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

Whether a right was "clearly established" is grounded in the notion of fair notice, and thus "[a] rule is too general if the lawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *District of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 199 L.Ed.2d 453 (2018) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034 (1987)). Thus, the Court of Appeals for the Seventh Circuit recently reminded courts that "clearly established law cannot be framed at a 'high level of generality.'" *Campbell*, 936 F.3d at 545 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074 (2011)). Rather, "[e]xisting caselaw must dictate the resolution of the parties' dispute," meaning that the "precedent must have placed the

. . . constitutional question beyond debate.'" *Campbell*, 936 F.3d at 545 (citations omitted).

Accordingly, courts must "[f]rame the constitutional right in terms granular enough to provide fair notice." *Id.*

Gross has not cited, and the court has not located, any authority suggesting that plaintiff's weekly allotment of out-of-cell recreation time fell below the standard required by the Eighth Amendment in June of 2016.[5] To the contrary, the cases discussed above, including the Seventh Circuit's *Davenport* decision and this court's *Jones* decision, suggest not only that the court must consider exercise time together with other out-of-cell time (such as dayroom time) when determining the adequacy of recreation time under the Eighth Amendment, but also that plaintiff's 3 hours and 30 minutes of exercise time and 6 hours of dayroom time, per week, passes constitutional muster. Since Gross cannot point to any Supreme Court or controlling circuit precedent establishing that plaintiff was entitled to more out-of-cell leisure or recreation time in 2016, defendants' qualified immunity defense succeeds here.

## B.     Medical Care

Defendants also seek judgment with respect to plaintiff's deliberate indifference claim as to his mental health needs. The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976), which includes a right

---

[5] Plaintiff also argues that the qualified immunity defense does not apply here because he is proceeding against defendants in their official capacities, as well as their individual capacities. Plaintiff is half right: qualified immunity does not apply to claims for injunctive relief, *Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010), but plaintiff is also seeking monetary damages against defendants. Besides the fact that this claim fails on the merits, defendants are still entitled to qualified immunity defense.

to appropriate mental health treatment. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Rice ex. Rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 665 (7th Cir. 2012). To prevail on a claim based on deficient medical care, the plaintiff must demonstrate two elements:  (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Defendants do not suggest that Gross's mental health issues did not constitute a serious medical need, so the only question before this court is whether the evidence of record permits a reasonable inference that any of the defendants failed to take reasonable measures in response to that need.

More specifically, to prove deliberate indifference to a serious medical condition, plaintiff must come forward with evidence that defendants acted with a "sufficiently culpable state of mind." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (quotation omitted).  While a prisoner does not need to "establish that officials intended or desired the harm that transpired," *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (citing *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)), deliberate indifference is more than negligence or even gross negligence, *Figgs v. Dawson*, 829 F.3d 895, 902-03 (7th Cir. 2016).  The official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825 (1994).

At screening, the court allowed plaintiff to proceed against defendants Boughton, Winkleski, Brown, Ray, Snodgrass, Kool and Sebranek in light of the allegations in his amended complaint, which permitted a reasonable inference that he informed all of these defendants that his mental health needs were not being met and none of them addressed

his complaints in an appropriate manner.  (8/30/18 Order (dkt. #11) 10-11.)  However, with the exception of Sebranek (who will be discussed separately below), none of the defendants are mental health professionals, and none took any steps to provide Gross with mental health care or treatment, nor does the record support a reasonable finding that he alerted any of them to his need for it.  Indeed, the undisputed evidence shows that Gross *never* raised a concern about his mental health deteriorating or of his need for mental health treatment in a manner that would have required defendants to take action.

At most, the evidence of record related to these communications shows that Gross: (1) asked for more details about the recreation schedule in letters to Unit Manager Kool and Security Director Kartman, (2) reported to Warden Boughton various issues, including the decrease in recreation time following the lockdown; and (3) complained in his various inmate complaints of "inadequate recreation periods," referencing his due process and equal protection rights throughout  (*see* Ex. 1007 (dkt. #31-2 through #31-9).  The court has been unable to locate anywhere in these communications an instance where plaintiff *specifically* requested mental health care, nor a statement that would make any of these defendants reasonably aware that he needed immediate psychological care.   Indeed, Gross has come forward with *no* evidence that he communicated a need for mental health treatment to any of these defendants.  Yet, to prove deliberate indifference, the trier of fact must find that an officer was "subjectively aware of the condition or danger complained of, but consciously disregards it."  *Rice*, 675 F.3d at 665.

Nevertheless, Gross now argues that these defendants should have *inferred* from his complaints that he was suffering from mental health issues, but that would be a tortured

reading of his actual letters and grievances, which were formulaic and apparently litigation-focused. Moreover, even proof that a defendant *should* have known about serious medical need is insufficient to prove deliberate indifference. *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) ("Deliberate indifference requires that the corrections officer must have 'actual knowledge' of the risk."). Since the evidence of record does not suggest that Gross alerted any of these defendants to a specific need for mental health care, it would be unreasonable to infer that their responses exhibited a reckless disregard to his need for mental health treatment, even though admittedly limited to conveying that WSPF's recreation allotment had been deemed sufficient.

As noted, the Eighth Amended analysis is different for Sebranek, as the only health care professional who responded to Gross's specific complaint that the lessened recreation periods were harming his mental health. Indeed, because Sebranek chose to provide *some* treatment by responding in writing to his PSRs, rather than seeing him in person, the question is whether her response demonstrates "such a substantial departure from accepted professional judgment, practice or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-61 (7th Cir. 1996). In applying this standard, courts are to defer to a medical professional's decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Here, Gross submitted two PSRs in September of 2016, complaining about more limited access to recreation time. Sebranek responded by explaining that she had conferred

with security, and was told she could not adjust his recreation allotment. She further instructed him to request an appointment if he wanted to discuss coping strategies. As for Gross's December 2016 PSR, it is undisputed that Sebranek did not review or respond at all.

The fact that Gross checked the box in each PSR asking to be seen does not, at least by itself, permit a reasonable inference that Sebranek's ultimate decision not to see him was deliberately indifferent.[6] While Gross may have wanted to be seen by psychological staff, the two, perfunctory requests he made in his PSRs did *not* suggest that being evaluated was his primary goal. To the contrary, Gross plainly wanted Nurse Sebranek, as a mental health care professional, to alert security of the adverse mental health consequences of a more restrictive recreation schedule, rather than any personal mental health assessment. If anything, Gross's reiterations and tone in his September 17 PSR underscored that he wanted Sebranek to intervene with security, as he mainly complains that Sebranek had a duty to "investigate" the *reason* for the recreation schedule change and to "advocate" on his behalf to ensure that his mental health needs were being met. (*See* Pl. Ex. 17 (dkt. #40-14).)

At minimum, these statements would permit a reasonable medical provider to infer that plaintiff was frustrated with Sebranek for deferring to security staff about the

---

[6] Even so, both Nurse Sebranek's *and* the Security Department's apparent belief that HSU lacks the power to insist on greater recreation time for inmates is disturbing. The court can certainly perceive of a potentially viable set of facts that would permit an individual (or even class of inmates to proceed on a deliberate indifference claim in the face of an arbitrary refusal to accommodate a serious medical need (whether physical or mental) with additional recreation time, particularly at a facility like WSPF. Rather, the court is simply finding on the record before it that this plaintiff has wholly failed to demonstrate that he had conveyed such a need.

recreation schedule, *not* that he wanted an appointment to address his mental health needs, nor even that it would be a worthwhile use of Sebranek's time to visit his cell following submission of the September 5 PSR.  Given that there is no evidence Sebranek had the authority to change the recreational schedule, and her observation that his out-of-cell time met DAI policy guidelines, the decision to repeat her recommendation that plaintiff reach out to the PSU for coping techniques or to schedule an appointment is not such a substantial departure from accepted norms that a reasonable, lay jury could find that Sebranek abandoned her professional judgment as a psychologist.  Perhaps other psychologists may have decided to speak with plaintiff in person (although there is no evidence of record suggesting that to be the case), but even that would amount to a mere disagreement about how to handle his PSR or *possibly* negligence, not an abandonment of professional judgment.  *Estate of Cole*, 94 F.3d at 261 ("Mere differences of opinion . . . regarding a patient's appropriate treatment do not give rise to deliberate indifference.").  This is particularly so in a case like this, where the plaintiff never described any symptoms of deteriorating mental health, given *any* sign of dissatisfaction or described *any* suicidal ideation.  Instead, he merely checked a box and then went on at length to discuss quite cogently the need for recreation.

Accordingly, since the evidence of record does not permit a reasonable trier of fact to conclude that *any* of the defendants failed to take reasonable measures in response to plaintiff's serious mental health needs, the court will grant defendants' motion for

summary judgment on the merits of his Eighth Amendment medical care claims as well.[7]

## II. Fourteenth Amendment

Finally, defendants seek summary judgment with respect to plaintiff's Fourteenth Amendment due process claim.  To succeed on this claim, plaintiff must prove that: (1) he has a liberty or property interest with which the state interfered; and (2) the procedures he was afforded were constitutionally deficient. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009); *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).  In the Seventh Circuit, "a liberty interest *may* arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009).  While courts in this circuit have generally concluded that short-term placements in segregation -- typically less than six months -- do not involve a liberty interest, longer periods of segregation *do* require inquiry into the conditions to determine if they impose an "atypical, significant" hardship. *Id.* at 697 (citing *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) (prisoners' liberty interests implicated when placed in segregation depriving them of virtually all sensory stimuli or human contact for an indefinite period of time).  As for the change in inmates' recreation schedule, defendants concede this was implemented without any notice or an opportunity for a hearing, but

---

[7] The court need not address defendants' qualified immunity defense, both because it is unnecessary and because his rights in this regard are clearly established.  *See Estate of Clark v. Walker*, 865 F.3d 544, 551-51 (7th Cir. 2017) (collecting cases articulating constitutional right to be free from deliberate indifference to a serious medical need).

argue that no reasonable juror could conclude that this incremental change constituted an interference with Gross's liberty interest.  On this record, the court agrees.

On one hand, Gross has come forward with evidence related to various restrictive aspects on the general population at WSPF that he believes establishes a loss of liberty. On top of restricting time periods for recreation, plaintiff also points out that his general population cell is virtually identical to his administrative confinement cell, both in size and access to natural light.  As a result, he argues there is little difference between administrative confinement and general population at WSPF, especially when compared to the cells for general population at GBCI, Waupun and Dodge, which were larger and provided more light.  He also points out that there is more access to larger recreation areas at those institutions.

On the other hand, Gross ignores several aspects of his general population confinement at WSPF that undermine his claim of loss of a protected liberty interest.  For example, Gross had (1) the opportunity for employment, (2) visitation on a weekly basis, (3) recreation time, (4) access to a law library, (5) reading materials, (6) a television, (7) the telephone, (8) the canteen, (9) adequate clothing and (10) materials to maintain his hygiene.  While Gross may quibble about the quality of these privileges, none support a reasonable finding of a loss of liberty.

For example, Gross complains that he personally was not hired for a prison job, but he had no right to employment.  *See DeWalt v. Carter*, 224 F.3d 607, 613 (7th Cir. 2000). He also complains that between January and June of 2015, access to in-person visitation was denied, but he does not suggest that he was precluded from video visitation periods

during that time. Most importantly, even accepting that he could not personally enjoy the full panoply of generally available privileges that defendants cite, Gross still had access to 6 hours of dayroom time per week, in addition to at least 2.5 hours (and often over 4 hours) of exercise time per week. In considering these conditions as a whole, a reasonable trier of fact could not conclude that plaintiff's experience in the general population (before or after the 2016 slowdown) were so harsh as to amount to a loss of liberty. *See Marion*, 559 F.3d at 697-98 ("a liberty interest may arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh").

Moreover, qualified immunity again shields defendants from monetary damages as to this claim. Here, the "clearly established right" plaintiff apparently claims was violated by structural and movement limitations at WSPF, which were restricted following the 2016 slowdown. Yet plaintiff has identified *no* pre-2016 Supreme Court or controlling circuit precedent that has held a prisoner with an analogous loss of privileges and limitations suffered a loss of a protectable liberty interest. The closest that the court could come is the Seventh Circuit's statement in *Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012), that due process requires prison officials to review periodically whether an inmate on administrative segregation status may be transferred to less restrictive housing. *Id*. at 686 (discussing *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983) (inmates have due process right to periodic review of administrative segregation placement), *abrogated in part on other grounds, Sandin v. Conner*, 515 U.S. 472 (1995). In 2016, however, one could not reasonably expect WSPF

prison officials to equate prisoners on administrative confinement at WSPF with those on general population status at other institutions based on *Westefer*.

If anything, by Gross's own admission, he received *more* privileges as he progressed out of administrative confinement status at WSPF. For that reason alone, it was certainly not "beyond debate" that Gross's conditions in general population following the June 2016 slowdown constituted a loss of liberty that implicated his due process rights. *Campbell*, 936 F.3d at 545-46. Accordingly, in addition to finding in their favor on the merits, qualified immunity once again shields defendants from liability for damages.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #27) is GRANTED.

2) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 11th day of December, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge